No. 25-11332

# United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

STEPHANIE HOCKRIDGE,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
The Hon. Reed C. O'Connor, Case No. 4:24-CR-00287

## CORRECTED BRIEF OF APPELLANT STEPHANIE HOCKRIDGE

Barbara Smith Tyson
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway, Ste 3600
St. Louis, MO 63102
(314) 259-2080
barbara.smith@bclplaw.com

Richard E. Finneran
Kolten C. Ellis
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway, Ste 3600
St. Louis, MO 63102
(314) 259-2367
richard.finneran@bclplaw.com
kolten.ellis@bclplaw.com

*Attorneys for Defendant-Appellant Stephanie Hockridge*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. **Defendant-Appellant:**

   Stephanie Marie Hockridge a/k/a Stephanie Reis

2. **Plaintiff-Appellee:**

   United States of America

3. **Counsel for Defendant-Appellant:**

   Barbara Smith Tyson
   Richard E. Finneran
   Kolten C. Ellis
   Bryan Cave Leighton Paisner LLP
   211 N. Broadway, Ste 3600
   St. Louis, MO 63102

**4. Counsel for Plaintiff-Appellee:**

Jeremy R. Sanders
Appellate Counsel
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
1400 New York Avenue, NW
Washington, DC 20005

Gail A. Hayworth
U.S. ATTORNEY'S OFFICE
NORTHERN DISTRICT OF TEXAS
1100 Commerce Street
Suite 300
Dallas, TX 75242-1074

*/s/ Barbara Smith Tyson*
Barbara Smith Tyson

*Attorney of Record for Defendant-Appellant Stephanie Hockridge*

## Statement Regarding Oral Argument

The court below sentenced Ms. Hockridge to 10 years in prison and restitution of more than $64 million based on the testimony of a single alleged coconspirator. It did so even though the jury acquitted her of all substantive wire fraud counts and was instructed it could convict her of conspiracy—the sole count of conviction—without finding she had actual knowledge of any falsehoods, or even that a coconspirator had committed an overt act within the district, as required to establish venue. Along the way, the court denied Ms. Hockridge's repeated requests to introduce exculpatory evidence and admitted scores of hearsay statements without making any findings that such statements were in furtherance of any conspiracy. Ms. Hockridge preserved each of these objections, but the court denied them in a one-paragraph order.

These significant issues would benefit from oral argument. Issues like venue, properly calculating loss, and determining when "deliberate ignorance" can substitute for actual knowledge are critical to most federal fraud prosecutions, not just Ms. Hockridge's. In light of the complexity of the appeal, Ms. Hockridge respectfully requests 20 minutes of oral argument.

## TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ..... ii

Statement Regarding Oral Argument ..... iv

Table of Authorities ..... ix

Jurisdictional Statement ..... 1

Statement of the Issues ..... 2

Statement of the Case ..... 3

Summary of Argument ..... 13

Argument ..... 15

I. Instructional Errors Below Permitted Conviction on an Insufficient Basis and Undercut Ms. Hockridge's Theory of Defense. ..... 15

A. The Instructions Improperly Allowed the Jury to Convict Without Sufficient Evidence of Venue. ..... 16

1. Venue for Conspiracy Lies Only Where an Agreement Is Formed or Where a Coconspirator Commits an Act to Further the Conspiracy. ..... 17

2. The Government Cannot Show the Instructional Error Was Harmless Beyond a Reasonable Doubt. ..... 19

B. The Instructions Improperly Allowed the Jury to Convict Without Proof Ms. Hockridge Either Had Actual Knowledge of Any Falsehood or Made Any Contrivance to Avoid Obtaining Knowledge. ..... 19

1. The Court Violated This Court's Directive That a Deliberate-Ignorance Instruction Is Improper When the Government Relies on Actual Knowledge. ..... 21

2. There Was No Evidence of a "Contrivance to Avoid Obtaining Actual Knowledge," As Required for a Deliberate-Ignorance Instruction........................23

3. The Government Cannot Prove the Erroneous Deliberate-Ignorance Instruction Was Harmless (Indeed, It Was Highly Prejudicial).............................24

II. Trial Errors—Insufficient Evidence of Venue and the Improper Admission and Exclusion of Evidence—Likewise Deprived Ms. Hockridge of a Fair Trial.........................................26

A. The Government Failed to Prove Venue ..............................26

B. The Erroneous Exclusion of Exculpatory Evidence Prejudiced Ms. Hockridge's Defense....................................31

1. Evidence Establishing Good Faith and Lack of Guilty Knowledge Was Improperly Excluded. ............32

2. The Erroneous Exclusion of Exculpatory Evidence Also Impermissibly Limited Ms. Hockridge's Cross-Examination of Karnezis...............36

3. The Government Cannot Prove the Erroneous Exclusion of the Exculpatory Evidence Was Harmless Beyond a Reasonable Doubt........................39

C. The District Court Erroneously Admitted Numerous Hearsay Statements Under Rule 801(d)(2)(E) Without Any Foundation They Were Made in Furtherance of the Alleged Conspiracy ........................................................40

1. The Court Improperly Admitted Scores of Hearsay Statements...................................................41

2. These Repeated Errors Require a New Trial. .............45

D. The District Court Erroneously Allowed the Introduction of Confidential Spousal Communications

by Conflating the Spousal Communications Privilege with the Spousal Testimonial Privilege ................................ 46

III. The Prosecution Violated *Brady* When It Withheld Exculpatory Evidence to Which It Had Access Via Its Coordinated Investigation with the Oregon USAO ....................... 47

A. *Brady* Requires the Government to Disclose Information the Prosecution Team Can Access. .................. 48

B. The Withheld Evidence Was Favorable and Material. ........ 51

C. The Cumulative Effect of the Withheld Evidence Establishes Its Materiality and Precludes a Finding of Harmlessness. ........................................................................ 55

IV. The District Court's Sentencing Errors Require Reversal. .......... 57

A. The Court Failed to Require the Government to Prove the Loans Included in Its Loss Calculation Were the Result of Any False Representations................................... 58

B. The Court Failed to Require the Government to Demonstrate What Portion of Any Loan Would Have Been Obtained Absent Any Alleged False Representation. ................................................................ 59

C. The Court Erroneously Precluded Ms. Hockridge from Calling Karnezis to Dispute the Government's Loss Calculations at Sentencing. ................................................ 61

D. The Court Erroneously Considered Conduct Underlying the Acquitted Counts in Sentencing Ms. Hockridge. ............................................................................ 63

V. The District Court Erroneously Imposed a Restitution Order Based on Its Own Loss Determination, Without Any Jury Findings. ...................................................................................... 66

A. After *Erlinger* and *Ellingburg*, Judicial Fact-Finding Cannot Support a Criminal Restitution Order. ................... 67

B. The District Court's Failure to Follow *Erlinger* and *Ellingburg* Requires Vacatur of the Restitution Penalty ........ 70

Conclusion ........ 70

Certificate of Service ........ 72

Certificate of Compliance ........ 73

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) .......... 67

*In re Bonvillian Marine Serv., Inc.*,
19 F.4th 787 (5th Cir. 2021) .......... 68

*Bourjaily v. United States*,
483 U.S. 171 (1987) .......... 41

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 11, 47

*Calley v. Callaway*,
519 F.2d 184 (5th Cir. 1975) .......... 47

*Delaware v. Fensterer*,
474 U.S. 15 (1985) .......... 36

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986) .......... 37

*Ellingburg v. United States*,
146 S. Ct. 564 (2026) .......... 68

*Erlinger v. United States*,
602 U.S. 821 (2024) .......... 68, 69

*Fratta v. Quarterman*,
536 F.3d 485 (5th Cir. 2008) .......... 43

*Giglio v. United States*,
405 U.S. 150 (1972) .......... 47

*Jones v. United States*,
574 U.S. 948 (2014) .......... 65

*Kousisis v. United States*,
605 U.S. 114 (2025) .......... 58

*Krulewitch v. United States*,
336 U.S. 440 (1949) .......... 45, 46

*Kyles v. Whitley*,
514 U.S. 419 (1995) .......... 56

*McClinton v. United States*,
143 S. Ct. 2400 (2023) .......... 64

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) .......... 66

*S. Union Co. v. United States*,
567 U.S. 343 (2012) .......... 69

*Strickler v. Greene*,
527 U.S. 263 (1999) .......... 48, 56

*United States v. Age*,
136 F.4th 193 (5th Cir. 2025) .......... 31

*United States v. Araiza-Jacobo*,
917 F.3d 360 (5th Cir. 2019) .......... 24, 25

*United States v. Archer*,
733 F.2d 354 (5th Cir. 1984) .......... 47

*United States v. Auten*,
632 F.2d 478 (5th Cir. 1980) .......... 47, 48, 49

*United States v. Barnes*,
979 F.3d 283 (5th Cir. 2020) .......... 58

*United States v. Brooks*,
681 F.3d 678 (5th Cir. 2012) .......... 23

*United States v. Brooks*,
966 F.2d 1500 (D.C. Cir. 1992) .......... 49

*United States v. Caro*,
569 F.2d 411 (5th Cir. 1978) .................................................. 26, 36, 40

*United States v. Cessa*,
861 F.3d 121 (5th Cir. 2017) ................................................................ 54

*United States v. Clenney*,
434 F.3d 780 (5th Cir. 2005) ........................................................ 30, 31

*United States v. Cornett*,
195 F.3d 776 (5th Cir. 1999) ................................................................ 42

*United States v. Crittenden*,
46 F.4th 292 (5th Cir. 2022) ................................................................ 45

*United States v. del Carpio Frescas*,
932 F.3d 324 (5th Cir. 2019) ................................................................ 60

*United States v. Delgado*,
672 F.3d 320 (5th Cir. 2012) (en banc) ................................................ 71

*United States v. Deutsch*,
475 F.2d 55 (5th Cir. 1973) .................................................................. 49

*United States v. Dvorin*,
817 F.3d 438 (5th Cir. 2016) ................................................................ 55

*United States v. Fells*,
78 F.3d 168 (5th Cir. 1996) .................................................................. 16

*United States v. Fragoso*,
978 F.2d 896 (5th Cir. 1992) ................................................................ 41

*United States v. Garcia Mendoza*,
587 F.3d 682 (5th Cir. 2009) ................................................................ 17

*United States v. Garner*,
507 F.3d 399 (6th Cir. 2007) ................................................................ 51

*United States v. Garvin*,
565 F.2d 519 (8th Cir. 1977) ................................................................ 32

*United States v. Guidry*,
456 F.3d 493 (5th Cir. 2006) .......... 41

*United States v. Gupta*,
848 F. Supp. 2d 491 (S.D.N.Y. 2012) (Rakoff, J.) .......... 49

*United States v. Hagen*,
60 F.4th 932 (5th Cir. 2023) .......... 36

*United States v. Hayes*,
219 F. App'x 114 (3d Cir. 2007) .......... 32

*United States v. James*,
590 F.2d 575 (5th Cir. 1979) (en banc) .......... 41

*United States v. Kuhrt*,
788 F.3d 403 (5th Cir. 2015) .......... 16, 22, 25

*United States v. Lee*,
966 F.3d 310 (5th Cir. 2019) .......... 20, 23, 31

*United States v. Mahmood*,
820 F.3d 177 (5th Cir. 2016) .......... 60

*United States v. Manges*,
110 F.3d 1162 (5th Cir. 1997) .......... 18, 30

*United States v. McConnell*,
988 F.2d 530 (5th Cir. 1993) .......... 43, 44

*United States v. Miles*,
360 F.3d 472 (5th Cir. 2004) .......... 28

*United States v. Miller*,
588 F.3d 897 (5th Cir. 2009) .......... 46

*United States v. Munoz*,
150 F.3d 401 (5th Cir.1998) .......... 71

*United States v. Nelson*,
732 F.3d 504 (5th Cir. 2013) .......... 60

*United States v. Nguyen*,
493 F.3d 613 (5th Cir. 2007) .......................................................... 23

*United States v. Nguyen*,
504 F.3d 561 (5th Cir. 2007) .................................................. 32, 40

*United States v. Niamatali*,
712 F. App'x 417 (5th Cir. 2018) ..................................................... 29

*United States v. Njoku*,
737 F.3d 55 (5th Cir. 2013) ............................................................ 64

*United States v. Odak*,
802 F. App'x 153 (5th Cir. 2020) ..................................................... 68

*United States v. Offutt*,
127 F.2d 336 (D.C. Cir. 1942) ........................................................ 32

*United States v. Onori*,
535 F.2d 938 (5th Cir. 1976) .......................................................... 37

*United States v. Oti*,
872 F.3d (5th Cir. 2017) ........................................... 21, 22, 23, 24

*United States v. Patterson*,
431 F.3d 832 (5th Cir. 2005) .................................................. 16, 19

*United States v. Reed*,
908 F.3d 102 (5th Cir. 2018) .......................................................... 44

*United States v. Romans*,
823 F.3d 299 (5th Cir. 2016) .......................................................... 27

*United States v. Rosbottom*,
763 F.3d 408 (5th Cir. 2014) .................................................. 66, 68

*United States v. Ryan*,
156 F.4th 583 (5th Cir. 2025) ......................................................... 16

*United States v. Sariles*,
645 F.3d 315 (5th Cir. 2011) .......................................................... 46

*United States v. Shakur*,
543 F. Supp. 1059 (S.D.N.Y. 1982) .......... 51

*United States v. Sharma*,
703 F.3d 318 (5th Cir. 2012) .......... 70

*United States v. Sipe*,
388 F.3d 471 (5th Cir. 2004) .......... 55, 56

*United States v. Skelton*,
514 F.3d 433 (5th Cir. 2008) .......... 37, 38

*United States v. Strain*,
396 F.3d 689 (5th Cir. 2005) .......... 17, 29, 30

*United States v. Thomas*,
690 F.3d 358 (5th Cir. 2012) .......... 17

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948) .......... 62

*United States v. Valencia*,
600 F.3d 389 (5th Cir. 2010) .......... 48

*United States v. Wieschenberg*,
604 F.2d 326 (5th Cir. 1979) .......... 17, 30

*United States v. Winship*,
724 F.2d 1116 (5th Cir. 1984) .......... 18

*In re Volkswagen of Am., Inc.*,
545 F.3d 304 (5th Cir. 2008) .......... 62

*Williams v. Whitley*,
940 F.2d 132 (5th Cir. 1991) .......... 51

**Constitution and Statutes**

U.S. Const. amend. VI .......... 16, 31, 36, 39–40, 67

18 U.S.C. § 1349 .......... 31, 63, 64

18 U.S.C. § 3231 .................................................................................1
18 U.S.C. § 3664 ...............................................................................58
28 U.S.C. § 1291 .................................................................................1

**Rules**

Fed. R. Crim. P. 18 ........................................................... 16, 31
Fed. R. Evid. 404 ........................................................... 33, 34, 36
Fed. R. Evid. 406 ........................................................... 33, 36
Fed. R. Evid. 801 ........................................................... 40–42

**Other Authorities**

U.S.S.G. § 1B1.3 ........................................................... 63, 64, 65
U.S.S.G. § 2B1.1 ........................................................... 57, 58, 60
Dep't of Just., *Justice Manual* § 9-5.002(A) .........................................50

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this criminal case under 18 U.S.C. § 3231. This appeal is taken from a final judgment entered November 25, 2025. ROA.2191. This Court thus has appellate jurisdiction under 28 U.S.C. § 1291. The notice of appeal was timely filed on December 5, 2025. ROA.2237, Fed. R. App. P. 4(b)(1)(A)(i).

## Statement of the Issues

1. Whether the court erroneously offered instructions on venue and deliberate ignorance, particularly where there was insufficient evidence of both.
2. Whether errors at trial—insufficient evidence of venue, the exclusion of exculpatory evidence, and the admission of hearsay and privileged communications—on their own or together warrant vacatur of Ms. Hockridge's conviction.
3. Whether *Brady v. Maryland* allows the government to withhold evidence possessed by prosecutors working together across Justice Department offices in a coordinated investigation.
4. Whether the court erred in applying the Guidelines by miscalculating the loss amount, accepting the government's calculation without permitting cross-examination, and punishing Ms. Hockridge for conduct for which she was acquitted.
5. Whether the Constitution permits a judge to impose a criminal restitution order without factual findings by the jury to support such a punishment.

## STATEMENT OF THE CASE

### *Background*

For more than 15 years, Stephanie Hockridge was a respected journalist, newscaster, and media consultant. R.Doc.281-1, ¶ 106-09.[1] Before this case, she had never been convicted, charged, or arrested for any crime, and she faces no pending charges in any jurisdiction. R.Doc.281-1, ¶¶ 85-91.

Ms. Hockridge left her career in journalism to start a family and help her husband, Nathan Reis, start a new business. R.Doc.281-1, ¶ 107. When COVID-19 hit, Mr. Reis applied for a loan for his and Ms. Hockridge's businesses through the federal Paycheck Protection Program ("PPP"). ROA.3386

This experience revealed to Mr. Reis and Ms. Hockridge that small businesses needed help to connect with PPP lenders. R.Doc.304 at 8. They created Blueacorn, a lender service provider that eventually grew to become one of the largest processers of small-business applications for PPP loans. *See* ROA.4994.

---

[1] All "R.Doc." citations refer to sealed documents lacking an Electronic ROA page number.

Blueacorn had comprehensive checks in place to detect and reject potentially fraudulent applications. ROA.5023-5024. Thanks to those checks, of the millions of applications Blueacorn received, it forwarded only approximately 800,000 to lenders for funding. ROA.2460, ROA.4994. In total, small businesses that applied through Blueacorn received more than $12 billion in forgivable loans. ROA.4994, ROA.4997-4998. Of that, the government alleged fraud in only approximately 0.5% (approximately $65 million). R.Doc.296 at 2, ROA.4376.

Ms. Hockridge also ran a related program, VIPPP, which acted as a referral agent for Blueacorn. ROA.3510-3511. Whereas Blueacorn primarily received applications through an online portal, VIPPP offered hands-on assistance to borrowers. ROA.3349. VIPPP helped nearly two thousand borrowers obtain loans. ROA.3947. About a quarter of those borrowers came to VIPPP through Eric Karnezis—the government's key witness—who duped Ms. Hockridge into believing he was the successful owner of a credit card processing company. ROA.4304-4305, 4325-4326, 4374-4375.

Because the government wanted to incentivize quickly processing PPP loans, Small Business Administration (SBA) regulations allowed

lenders and their agents to rely upon the representations made by borrowers and "held [them] harmless" from liability for misstatements in borrower applications. ROA.4436 (SBA witness acknowledging that lender service providers had no obligation to verify loan applications for accuracy and that program relied on self-certifications by borrowers). The SBA's approach was instead to "pay first" and only "chase afterwards to find anybody who had submitted a fraudulent application." ROA.4468.

Nevertheless, Ms. Hockridge took steps to detect and prevent fraud, including training her staff to identify fraud based on criteria provided by the Secret Service and raising concerns with Karnezis on multiple occasions regarding inconsistencies in the applications he referred to VIPPP. ROA.2408, ROA.6678-6682. In response, Karnezis falsely assured her that his borrowers were legitimate. ROA.4377. In one instance, Ms. Hockridge flagged hundreds of applications for suspected fraud and rejected them, excoriating Karnezis for allowing others to submit fraudulent applications using his credentials. ROA.4265-4366. Again, Karnezis provided false excuses to Ms. Hockridge and deflected blame. ROA.4377, 4380.

The government ultimately investigated Karnezis and others for fraud. The investigation was coordinated among the U.S. Department of Justice and the U.S. Attorney's Offices for the Northern District of Texas and the District of Oregon, which eventually prosecuted Karnezis. *See* ROA.5799-5800 (government attorney describing Oregon USAO review of Karnezis loans as "part of *this* investigation" (emphasis added)); ROA.2159 (acknowledging prosecutors from both Oregon and Texas participated in interviews with Karnezis and his brother). Karnezis originally told investigators that Ms. Hockridge was "making sure things were clean," ROA.2509, and "had a bunch of systems to catch fraud," ROA.4248. That was consistent with the government's assurances to Ms. Hockridge, immediately prior to her voluntary interview, that she was not a target of its investigation. ROA.3859. Subsequently, Karnezis was charged with fraud and conspiracy, decided to become a cooperating witness, and eventually changed his story to implicate Ms. Hockridge. ROA.3933-3934. The government charged her based on that changed testimony. ROA.3033.

### *Trial*

Ms. Hockridge was tried on five counts alleging she conspired to and committed wire fraud by processing applications that allegedly included false statements by borrowers. ROA.1123-1135. Although the indictment alleged Ms. Hockridge "knowingly" joined that conspiracy, ROA.1126, the government later changed course and argued "deliberate ignorance," claiming at sentencing that it was "never part of [its] theory" that she "knew about all the downstream" fraud by VIPPP borrowers, ROA.5818.

The government's conspiracy theory focused primarily on whether Ms. Hockridge knew that loan applications Karnezis submitted to VIPPP contained material falsehoods. Karnezis testified at trial pursuant to a cooperation agreement. ROA.4383-4386. Despite hundreds of WhatsApp messages between Ms. Hockridge and Karnezis, *see* ROA.6675-6785, the government did not identify a single written communication in which Karnezis informed Ms. Hockridge about a falsehood in any application she processed. ROA.4369 (Karnezis admitting there were no "blatant messages" about fraud). Ms. Hockridge sought to cross-examine Karnezis by highlighting ways he hid his fraud from her and falsely

assured her that applications he submitted were legitimate or deflected blame to others. ROA.4367-4374. But the Court hamstrung those efforts by excluding dozens of pieces of exculpatory evidence showing Ms. Hockridge had attempted to ***prevent*** fraud by borrowers, including flagging potentially fraudulent applications Karnezis had submitted. ROA.3076, 3973-3975, 3976-3977.

After Ms. Hockridge filed a midtrial motion to reconsider the exclusion of that exculpatory evidence, the court reversed course and admitted a small portion of what Ms. Hockridge had sought to introduce. *See* R.Doc.208, ROA.5268-5270. But by then, Karnezis had left the stand and the government had released him from subpoena, so Ms. Hockridge could not cross-examine him further. ROA.4390.

The court also admitted, over Ms. Hockridge's objection, scores of hearsay statements by alleged coconspirators without any foundation that they furthered the conspiracy. ROA.1906-1907. And it admitted privileged communications on the discredited theory that the spousal privilege applied only to testimony, not to out-of-court communications. ROA.488-490, 3046.

### *Jury Instructions*

Both before trial and at the charge conference, Ms. Hockridge objected to the government's proposed instructions on venue and deliberate ignorance and tendered her own alternatives. ROA.985, 1010-1011, ROA.5357-5423.

On venue, the court delivered an instruction that ***omitted*** a key element of venue that the jury was required to find, namely, that a coconspirator had committed an overt act in furtherance of the conspiracy within the district. ROA.1010-1011, ROA.1660. It did so despite the government's agreement that Ms. Hockridge's proposed instruction correctly stated the law. ROA.5547. The court also gave a deliberate-ignorance instruction, ROA.1655, notwithstanding the government's pretrial disclaimer of a deliberate-ignorance theory, ROA.541, and even though the government did not present a submissible case of deliberate ignorance. ROA.1874-1877.

### *The Verdict and Its Aftermath*

The jury acquitted Ms. Hockridge on all four wire fraud counts, but convicted on the sole conspiracy count. ROA.1667, *cf.* ROA.1664.

After the verdict, the court permitted counsel to speak with six jurors. With counsel for both parties present, the jurors revealed they (incorrectly) believed they should convict Ms. Hockridge of conspiracy so long as there was a "sliver of evidence." R.Doc.268, R.Doc.268-1 ¶ 12. Worse, the jurors did not apprehend the necessity of unanimously deciding whether Ms. Hockridge conspired with anyone in particular, a question the jurors "didn't really talk about." R.Doc.268-1, ¶ 12. Instead, they believed conspiracy could be established if Ms. Hockridge merely "didn't stop" fraudulent applications, even if she did not know of any material falsehoods in them. R.Doc.268-1, ¶ 20.

Ms. Hockridge filed posttrial motions asserting each of the trial-related errors she raises on appeal. ROA.1795, ROA.1801. The court denied the motions in an unreasoned order. ROA.2079.

### *Belated* **Brady** *Disclosures*

Months after trial, shortly before sentencing, the government produced three witness interviews it had withheld. Those documents came from the Oregon USAO, where Karnezis was charged. ROA.2110-2112. The documents included significant new impeachment evidence, including admissions by witnesses who conspired with Karnezis to

submit fraudulent applications ***before*** Ms. Hockridge met him—directly refuting Karnezis's testimony that Ms. Hockridge had trained ***him*** to commit fraud. ROA.2116-2145.

Ms. Hockridge argued this violated *Brady v. Maryland*, 373 U.S. 83 (1963), because the government had access to the witnesses' statements—as evidenced by the fact that it produced ***hundreds of thousands*** of pages from the Oregon USAO pretrial, ROA.5814—but the court nonetheless excused the belated disclosure. ROA.2179. The court also denied Ms. Hockridge's motion to compel additional discovery regarding the newly disclosed witnesses. ROA.2162.

***Sentencing***

Notwithstanding recent Guidelines amendments precluding it from considering "acquitted conduct," the court sentenced Ms. Hockridge as if she had been convicted of wire fraud. Despite her objections to the presentence report, the government presented no witnesses at sentencing, and the court denied Ms. Hockridge the right to call Karnezis to interrogate his claims about the extent of his fraud and its foreseeability to Ms. Hockridge, which were relevant to the court's loss calculations. ROA.5825. Instead, the court treated one line of Karnezis's

trial testimony, that "90%" of the applications submitted through his "pipeline" were fraudulent, ROA.4271, as conclusively establishing a much broader proposition: that 90% of the ***funded*** applications were fraudulent, ROA.5810.

Ms. Hockridge called a former FBI Agent and CPA who reviewed the government's "evidence." ROA.5774. As he explained, the government had obtained bank records or tax returns for only ***five*** of the 449 loans it alleged were fraudulent and thus had not presented sufficient evidence to demonstrate the applications included any material falsehoods. ROA.5775-5797.

Despite the government's assertion that it was "never part of [its] theory" that Ms. Hockridge "knew about all the downstream" fraud by VIPPP borrowers, ROA.5818, the court found Ms. Hockridge responsible for nearly $64 million in alleged (but unproven) losses. ROA.5849-5850. It also ordered restitution in that amount, even though the jury had not found facts permitting restitution. ROA.2194, ROA.5851.

## SUMMARY OF ARGUMENT

A conviction on conspiracy coupled with four acquittals on wire fraud demands "judicial skepticism." The government's closing argument to the jury—that fraud "swirled around" Ms. Hockridge—landed. She was convicted not because she joined a conspiracy, but because she "didn't stop" it. That unjust outcome arose from a trial riddled with error, and a sentencing that failed to account for significant holes in the government's proof. Whether considered together or separately, those errors require reversal and remand.

*First*, the court committed several instructional errors. It gave an improper instruction on venue, allowing conviction without evidence that any coconspirator committed an overt act in furtherance of the conspiracy within the district. It improperly instructed on actual knowledge ***and*** deliberate ignorance, inconsistent theories which the evidence did not support and the law does not allow. And it refused Ms. Hockridge's proposed alternative instructions that would have helped the jury avoid its errant and inconsistent verdict.

*Second*, the trial itself compounded errors on top of one another. The court erroneously allowed the verdict to stand absent evidence of

venue. It improperly excluded significant exculpatory evidence showing Ms. Hockridge worked to detect and reject fraudulent applications, prejudicing Ms. Hockridge's defense and violating her right to confront and impeach the government's star witness. And it permitted scores of hearsay statements that had no proper foundation and admitted private spousal conversations that no jury should hear.

*Third*, the trial's fairness was jeopardized not only by evidence improperly ***excluded*** and improperly ***admitted***, but also by evidence improperly ***withheld***. The court erroneously excused the government from failing to disclose exculpatory evidence before trial that undercut the testimony of the government's star witness. It did so because it wrongly believed that the prosecutors did not physically ***possess*** those materials (which the trial team requested and received from the Oregon USAO), even though *Brady* requires production of any exculpatory evidence prosecutors have ***access*** to.

*Fourth*, even if the trial had been sound, the sentence was not. The court employed an improper methodology for calculating the loss amount by (1) failing to identify what if any portion of any loan resulted from falsehoods, (2) prohibiting cross-examination of the sole witness whose

testimony undergirded the government's calculations, and (3) relying on conduct of which Ms. Hockridge was acquitted, in violation of the Guidelines' new definition of "relevant conduct."

*Finally*, the court erred by imposing a criminal restitution order of nearly $64 million even though the jury found no facts that would support any restitution amount. As the Supreme Court's recent cases make clear, a jury must find all facts necessary to impose a restitution order.

## ARGUMENT

### I. Instructional Errors Below Permitted Conviction on an Insufficient Basis and Undercut Ms. Hockridge's Theory of Defense.

The court below committed multiple instructional errors that require vacatur. First, the court rejected Ms. Hockridge's proposed venue instruction, thereby allowing conviction without sufficient evidence of venue. *See infra* § I-A. Second, and contrary to this Court's precedents, the court allowed the jury to receive both an actual-knowledge instruction and a deliberate-ignorance instruction, despite a lack of evidence that Ms. Hockridge "purposely contrived" to avoid learning of any criminal conduct (i.e., that she was deliberately ignorant). Ms. Hockridge preserved her objections to those instructions. ROA.985, 1010-1011, ROA.5357-5423.

Whether alone or together, those errors constituted an abuse of discretion. *See United States v. Ryan*, 156 F.4th 583, 596 (5th Cir. 2025). As to venue, the refused instruction was "(1) substantively correct, (2) not substantially covered in the jury charge, and (3) concern[ed] an important point in the trial," namely, an absent element of proof. *Id.* (quotation omitted). The deliberate-ignorance instruction was an abuse of discretion both because it is legal error to give it alongside an actual-knowledge instruction and because there was insufficient evidence to support it. *United States v. Kuhrt*, 788 F.3d 403, 416-17 (5th Cir. 2015). The government cannot prove those errors were harmless. *See United States v. Patterson*, 431 F.3d 832, 837 (5th Cir. 2005).

### A. The Instructions Improperly Allowed the Jury to Convict Without Sufficient Evidence of Venue.

The Constitution guarantees a defendant a trial in the district where the alleged crime was committed. U.S. Const. amend. VI; *see* Fed. R. Crim. P. 18. Yet here, the government failed to carry its burden to prove that venue was proper in the Northern District of Texas. *United States v. Fells*, 78 F.3d 168, 170 (5th Cir. 1996). The trial therefore violated the Sixth Amendment and the Rules of Criminal Procedure.

Ms. Hockridge requested a venue instruction requiring the jury to find an act in furtherance of the conspiracy ***by a coconspirator*** in the district, as the law requires. *See* ROA.5545, *cf.* ROA.1010-1011. But the court adopted the government's proposed instruction, which allowed conviction if "an overt act took place in this district," eliding the requirement that the act be performed "by a coconspirator." *See* ROA.1660, ROA.5551. That was error.

### 1. Venue for Conspiracy Lies Only Where an Agreement Is Formed or Where a Coconspirator Commits an Act to Further the Conspiracy.

For conspiracy, "'venue is proper in any district where the agreement was formed or an overt act occurred.'" *United States v. Thomas*, 690 F.3d 358, 369 (5th Cir. 2012) (quoting *United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2009)). But the phrase "overt act" is an incomplete shorthand—the only "acts" that counts are ones "committed ***by one of the coconspirators*** in furtherance of the conspiracy." *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir. 1979) (emphasis added). That is because venue only lies "where the criminal act is done." *United States v. Strain*, 396 F.3d 689, 694 n.5 (5th Cir. 2005) (cleaned up).

Thus, a conspiracy prosecution can occur only where (1) the conspiratorial agreement was made, or (2) a ***coconspirator*** commits an act to ***further*** the conspiracy. That is exactly the instruction Ms. Hockridge requested—which the government conceded accurately stated the law. ROA.5534. But the court's instruction allowed the jury to find venue based on the "act" of a non-party to the conspiracy. That is wrong as a matter of law. *See United States v. Manges*, 110 F.3d 1162, 1170 (5th Cir. 1997) ("posting of a letter by a non-conspirator" was not an act in furtherance of a conspiracy even when necessary to accomplish the conspiracy's aims).

The government objected to Ms. Hockridge's proposed (and accurate) instruction. It did so because it feared Ms. Hockridge would argue that "nobody set foot in the district, no co-conspirator did anything physically in the district." ROA.5547. In other words, the government worried Ms. Hockridge might argue that the government could not prove venue. But holding the government to its proof is the ***point*** of instructing on venue, an issue that "bear[s] on the fair administration of criminal justice and public confidence in it." *See United States v. Winship*, 724 F.2d 1116, 1124 (5th Cir. 1984) (cleaned up).

#### 2. The Government Cannot Show the Instructional Error Was Harmless Beyond a Reasonable Doubt.

As explained below, the government did not establish venue by a preponderance of the evidence, a sufficiency-of-the-evidence problem that independently requires relief. *See infra* § II-A. But the instructional error itself requires reversal, because the government cannot show the erroneous instruction was harmless beyond a reasonable doubt. *See Patterson*, 431 F.3d at 837. That is because the evidence the government introduced does not establish venue. As explained below, the evidence was (1) conduct by a third-party bank (not ***a coconspirator***); and (2) presence in the district by alleged coconspirators (not acts ***in furtherance of the conspiracy***), neither of which meets the governing test. The two errors on venue—erroneous instructions and insufficient evidence—are independent and compounding problems: the erroneous instruction concealed the insufficiency problem, making the error not harmless.

### B. The Instructions Improperly Allowed the Jury to Convict Without Proof Ms. Hockridge Either Had Actual Knowledge of Any Falsehood or Made Any Contrivance to Avoid Obtaining Knowledge.

Before trial, the government disclaimed reliance on a deliberate-ignorance theory and asserted it would prove that Ms. Hockridge had

actual knowledge of fraud. ROA.541. At trial, it did just that, repeatedly claiming (albeit unconvincingly, given the acquittals) that Ms. Hockridge had actual knowledge. ROA.5563. Yet in an abrupt shift, after the close of evidence, the government sought (and, over objection, the court gave) a deliberate-ignorance instruction. ROA.4836, ROA.1655

That instruction was erroneous. This Court cautions that a deliberate-ignorance instruction "should rarely be given." *United States v. Lee*, 966 F.3d 310, 323 (5th Cir. 2019). A deliberate-ignorance instruction requires a "compelling justification" because it "runs the risk of confusing the jury and convicting a defendant who merely *should have been aware* of criminal conduct." *Id.* at 326 (citation modified) (emphasis added). No such justification existed here, making the deliberate-ignorance instruction improper because it allowed the jury to convict Ms. Hockridge based on her proximity to alleged fraud by the borrowers whose applications she processed, rather than her participation in any conspiracy.

### 1. The Court Violated This Court's Directive That a Deliberate-Ignorance Instruction Is Improper When the Government Relies on Actual Knowledge.

"Where the government relies on evidence of actual knowledge, the deliberate ignorance instruction is not appropriate." *United States v. Oti*, 872 F.3d at 678, 697-98 (5th Cir. 2017). The government here relied on actual knowledge at every stage.

Before trial, the government represented that its case rested on actual knowledge. In response to one of Ms. Hockridge's pretrial motions, the government accused Ms. Hockridge of "misconstru[ing]" its case by suggesting its case rested on her being "willfully blind" or "deliberately ignorant." ROA.541. The government averred it would prove "*actual knowledge*" of fraudulent loan applications, or that Ms. Hockridge was "*directly instructing coconspirators* on how to falsify loan documents." ROA.541 (emphases added).

During its case-in-chief, the government repeatedly attempted (unsuccessfully) to convince the jury of Ms. Hockridge's actual knowledge. *See, e.g.*, ROA.5205 (government witness acknowledging that Ms. Hockridge was not part of text communications discussing a loan she was acquitted of fraudulently obtaining). At the charge conference, when

the court inquired whether "there was actual knowledge," the government responded, "Yes, Your Honor, we do believe there was actual knowledge." ROA.5357. The ***first words*** of the government's closing were: "She knew. She knew. Stephanie Hockridge knew this was fraud all along." ROA.5578. Plainly, "[r]ather than being a case of deliberate ignorance, the government's case" against Ms. Hockridge "was that [she] actually knew" of the alleged fraud. *See Oti*, 872 F.3d at 698 & n.15 (deliberate-ignorance instruction improper where "at oral argument, the government stated that there was 'overwhelming evidence as to actual knowledge'").

The government's defense of its instruction mirrors what this Court rejected in *Oti*. The government claimed "multiple witnesses" had "directly implicated [Ms. Hockridge] in the fraud," including testimony that Mr. Reis "openly talk[ed] about the fraud in [the witness's] presence in front of [Ms. Hockridge]." ROA.1562-1564. That is an argument for ***actual knowledge***, not willful blindness—and, just like *Oti*, inconsistent with a deliberate-ignorance instruction. Thus, the deliberate-ignorance instruction served only as an improper "backup or supplement." *Kuhrt*, 788 F.3d at 417. The government's consistent

refrain that Ms. Hockridge had actual knowledge precluded providing a deliberate-ignorance instruction as a failsafe. *Lee*, 966 F.3d at 326; *Oti*, 872 F.3d at 697-98.

### 2. There Was No Evidence of a "Contrivance to Avoid Obtaining Actual Knowledge," As Required for a Deliberate-Ignorance Instruction.

Even if the government had not relied on actual knowledge at trial, the deliberate-ignorance instruction would still have been inappropriate because the government did not put on evidence warranting it. To instruct on deliberate ignorance, there must be evidence not merely that a defendant was aware of a high probability of criminal conduct, but that she "purposeful[ly] contriv[ed] to avoid learning" of it. *See United States v. Nguyen*, 493 F.3d 613, 619 (5th Cir. 2007) (quotation omitted); *see United States v. Brooks*, 681 F.3d 678, 702 (5th Cir. 2012).

The government offered no evidence of either. To the contrary, the evidence showed that the official SBA guidance, designed to facilitate the speedy disbursement of PPP loans, entitled Ms. Hockridge to rely on borrower certifications ***without*** investigating the veracity of their representations. The SBA regulations required neither lenders nor lender service providers to "certify that [a] borrower's statements were

true"; instead, they were "entitled to rely upon borrower certifications," ROA.4396-4397, because "[t]he *borrower* was responsible for certifying that it was eligible" for a loan, ROA.4432-4437 (emphasis added), *see also* ROA.4953-4954. Notwithstanding those legal protections, Ms. Hockridge still undertook measures to detect and reject fraudulent applications, further undermining any claim that she "purposefully contrived" to avoid learning of borrowers' falsehoods. That the court excluded much of that evidence compounds the prejudice from the erroneous deliberate-ignorance instruction. *See infra* § II-B.

#### 3. The Government Cannot Prove the Erroneous Deliberate-Ignorance Instruction Was Harmless (Indeed, It Was Highly Prejudicial).

This Court has repeatedly warned that an improper deliberate-ignorance instruction threatens to "water down the *mens rea* requirement of the charged crimes." *United States v. Araiza-Jacobo*, 917 F.3d 360, 367 (5th Cir. 2019). That danger is particularly acute here, where the jury ***acquitted*** Ms. Hockridge of wire fraud, suggesting that the jury improperly "convict[ed] based on negligent or reckless ignorance rather than *intentional* ignorance." *Oti*, 872 F.3d at 697 (emphasis added, citation omitted). The government should have been required to

"prov[e] beyond a reasonable doubt that [s]he 'knowingly and intentionally' committed the proscribed conduct," that is, that she knowingly and intentionally avoided learning of the alleged fraud. *Araiza-Jacobo*, 917 F.3d at 367 (5th Cir. 2019). The government instead invited the jury to convict on its watered-down theory in closing:

- "[T]he defendant helped others get plainly fraudulent loans. ***There's fraud swirling all around this case. And she is right there in the middle of it***." ROA.5580 (emphasis added).
- "Again, ***it defies common sense***, reason, all the evidence to think ***that she had no idea*** what was going on." ROA.5645 (emphases added).

The jury acquitted Ms. Hockridge of all four wire fraud charges, finding that there "wasn't any proof that she was involved in those counts." R.Doc. 268-1 ¶ 17. As its verdicts themselves reflect, the jury rejected the notion that Ms. Hockridge actually knew of false statements in the borrowers' applications.

Instead, the jury convicted of conspiracy because it (wrongly) thought that a "sliver of evidence" Ms. Hockridge knew "what was going on" but "didn't stop it" was sufficient to convict, even though they "didn't really talk about" who (if anyone) she conspired with in particular. R.Doc. 268-1, ¶ 20; *cf. Kuhrt*, 788 F.3d at 417 ("Undoubtedly, the

deliberate-ignorance instruction is 'inappropriate for an offense which requires a specific purpose by the defendant.'" (citation omitted)). Especially given the "judicial skepticism" this Court applies to split verdicts like this one, the government cannot establish harmlessness beyond a reasonable doubt in light of such a clearly prejudicial instruction. *Cf. United States v. Caro*, 569 F.2d 411, 418 (5th Cir. 1978) (explaining that conviction for conspiracy coupled with acquittal of substantive count "should engage our judicial skepticism").

## II. Trial Errors—Insufficient Evidence of Venue and the Improper Admission and Exclusion of Evidence—Likewise Deprived Ms. Hockridge of a Fair Trial.

### A. The Government Failed to Prove Venue

The government failed to offer evidence of the one fact venue requires: an overt act ***by a coconspirator*** in the district committed in ***furtherance*** of the conspiracy.[2] *See supra* § I-A. Instead, it offered scant evidence of fleeting physical presence by alleged coconspirators within the district, and evidence of an act ***by a third party*** in the district. Because the evidence of venue was insufficient as a matter of law, the

[2] The government never argued (and presented no evidence to support) that a conspiracy was formed in the district, the first basis on which it could have established venue.

government failed to present a submissible case of conspiracy, requiring reversal on *de novo* review. *See United States v. Romans*, 823 F.3d 299, 309 (5th Cir. 2016) (requiring de novo review of preserved venue challenge).

The government's purported evidence of venue consisted of two WhatsApp conversations. The first was a conversation between Mr. Reis, while he was at the Dallas airport, and James Flores (an alleged coconspirator of Mr. Reis). In that conversation, the two discussed steps for making Blueacorn compliant and successful, including hiring underwriters and working with partners who would "understand PPP as well as a CPA or banker would." *See* ROA.6607, ROA.3391. The government offered no evidence that those texts were sent in furtherance of any criminal activity. Nothing in those texts even hinted at criminality—and Flores testified (and the government acknowledges) that Blueacorn had significant legitimate business operations separate and apart from any fraud. *See* ROA.3492, 3522 (Flores testifying his role

at Blueacorn included helping banks resolve issues for legitimate loans and borrowers understand how to structure their loans correctly).[3]

The mere fact that a business may engage in some criminal activity does not make every action performed by that business, much less a text message that simply describes the potential future of such a business, an act "in furtherance" of any conspiracy. *Cf. United States v. Miles*, 360 F.3d 472, 478-79 (5th Cir. 2004) (even a "substantial level of fraud" does not necessarily transform a "legitimate business" into a purely fraudulent endeavor). And regardless, the government put on no evidence to that effect.

In the second text (a single message), Ms. Hockridge responded to a potential loan applicant, Jessica Stackpoole, with her travel plans, stating Ms. Hockridge was in Dallas and would be returning shortly to Arizona. ROA.3773–3775, ROA.2402. Here again, the conversation did not suggest any criminality, and the government offered nothing to support such an inference. Indeed, the government never presented evidence (or even argued) that Ms. Stackpoole submitted a fraudulent

[3] This and the other text exchange offered by the government also constituted inadmissible hearsay and should not have been admitted in the first place. *See infra* § II-C.

loan application, so there was no evidence that single message was in furtherance of any conspiracy. Worse, the date of the message—December 30, 2020—was during a time when the SBA was not even accepting PPP applications, ROA.4954, making it unlikely that such communications could have furthered any conspiracy involving Ms. Stackpoole.

In short, the government did not carry its burden to prove that either of these statements was ***in furtherance of any conspiracy***. At most, the evidence showed that Ms. Hockridge and one alleged coconspirator were present in the district on two isolated occasions. But venue does not lie simply because a coconspirator passes through a district during a conspiracy. Only "proscribed conduct" that "constitut[es] the offense" can establish venue. *Strain*, 396 F.3d at 694 & n.5 (emphasis added, quotation omitted); *United States v. Niamatali*, 712 F. App'x 417, 420 (5th Cir. 2018) (an "overt act" is an act "performed to effect the object of a conspiracy" (citation modified)).

Realizing its proof problem on venue, the government pivoted on the seventh and final day of trial. It argued for a novel definition of venue that this Court has never recognized, namely, that venue could lie

whenever a conspirator (metaphorically) "reaches into" a district by causing ***effects*** there, without any requirement the coconspirator be physically present. *See* ROA.5532. Under that novel theory, it claimed that venue was proper because a non-conspiring bank disbursed loan funds in the district. ROA.5533. But that ignores this Court's requirement that only acts by ***conspirators*** matter for venue. *Wieschenberg*, 604 F.2d at 331. Even an act that is "a necessary step in the plot" to achieve the conspiracy's objectives ***is not*** an "overt act" upon which a conspiracy prosecution can be founded when the act is done by a non-conspiring third party, *see Manges*, 110 F.3d at 1170, and thus cannot be the predicate for venue, *see United States v. Clenney*, 434 F.3d 780, 781-82 (5th Cir. 2005) (holding venue lies only where the actor was "physically present" when he committed an "essential conduct element" of a crime). Since the government presented no evidence of such "proscribed conduct" by a coconspirator within the district, the jury could not have rationally found venue in the district, even if it had been properly instructed. *Strain*, 396 F.3d at 694. Vacatur is therefore required.

In addition, to preserve the issue for further review, because 18 U.S.C. § 1349 does not require an overt act, such acts are not "essential conduct element[s]." *Clenney*, 434 F.3d at 781-82. Thus, under a proper understanding of the Sixth Amendment and Federal Rule 18, venue under § 1349 is proper only where the conspiracy was formed, not where an overt act occurred. *But see Lee*, 966 F.3d at 319 n.1 (holding overt act made venue proper even though charge had no such element).

### B. The Erroneous Exclusion of Exculpatory Evidence Prejudiced Ms. Hockridge's Defense.

Overwhelming evidence demonstrated Ms. Hockridge's good faith in helping borrowers properly apply for PPP loans, including actively intervening to prevent suspected fraud. But the court excluded the admission of that evidence until late in the day—and then admitted only a small part of it. That prevented Ms. Hockridge from mounting a successful defense and from confronting the government's key witness with facts that directly contradicted his accusations against her.

While the Court reviews ordinary evidentiary challenges under an abuse-of-discretion standard, this Confrontation Clause challenge is subject to *de novo* review. *See United States v. Age*, 136 F.4th 193, 227 (5th Cir. 2025). Regardless, to avoid reversal, the government must

prove the error was harmless beyond a reasonable doubt, which it cannot do. *United States v. Nguyen*, 504 F.3d 561, 571-73 (5th Cir. 2007).

### 1. Evidence Establishing Good Faith and Lack of Guilty Knowledge Was Improperly Excluded.

To disprove *mens rea* elements of the government's conspiracy charge—that she knew of falsehoods in borrower applications and intended to conspire to commit wire fraud—Ms. Hockridge sought to introduce evidence of her good faith, including overwhelming evidence that she flagged and rejected suspicious applications as part of the very same loan review process the government alleged was fraudulent. As Ms. Hockridge argued, "[a]s is true with bad act evidence," the evidence was "admissible for a proper purpose such as motive, intent, absence of mistake, etc." *United States v. Hayes*, 219 F. App'x 114, 116 (3d Cir. 2007); *see also United States v. Garvin*, 565 F.2d 519, 522 (8th Cir. 1977) (evidence of proper applications admissible to show lack of intent to defraud); *United States v. Offutt*, 127 F.2d 336, 340 (D.C. Cir. 1942) ("Prior behavior, however, might tend to disprove intent or even the existence of the conspiracy."). The court erroneously excluded that evidence pretrial. *See* ROA.3976-3977.

Yet on the sixth and penultimate day of trial, the court partially reversed course. At that point, with the government's case concluded and Karnezis off the stand, the court allowed Ms. Hockridge to introduce a limited number of exculpatory statements during her own case, without a sponsoring witness. *See* ROA.5272-5273. But that late-breaking ruling still erroneously excluded significant exculpatory evidence and came too late in the day. The jury had already heard days of testimony without that crucial context, thereby depriving Ms. Hockridge of her ability to mount an effective defense.

Even then, the court stopped short of what the Federal Rules of Evidence required. Rule 404(b)(2) permits the introduction of other-acts evidence, to prove (or disprove) "plan," "knowledge," and "intent"—each of which were elements of the charged offenses. *See* ROA.1123-1135. Likewise, Rule 406 permits the introduction of evidence to establish Ms. Hockridge's habit and routine practice of instructing others on how to properly process applications and how to address suspected fraud. *See* Fed. R. Evid. 406.

The evidence Ms. Hockridge sought to offer was admissible under either rule: it directly disproved the government's contention that she

knowingly participated in a conspiracy. *See, e.g.*, ROA.3973, R.Doc.208-1 at 1-7 (summarizing a small portion of the evidence Ms. Hockridge wished to introduce). The excluded evidence demonstrated Ms. Hockridge was actively working to detect and reject potentially fraudulent applications, even though SBA guidelines did not require her to exercise such diligence. *See* R.Docs.208-1, 208-2, 208-3.

In one such exchange, Ms. Hockridge told a processor she would "break the news about [an applicant's] business that doesn't qualify" for a PPP loan. *See* R.Doc. 208-1, at 32. That evidence should have been admitted under Rule 404(b), because the fact that Ms. Hockridge was, in good faith, ***rejecting*** ineligible applications suggests she was not knowingly part of a conspiracy to ***submit*** such applications.

In another instance, Ms. Hockridge castigated a loan processor for overlooking inflated numbers on an application, asking "Did you think this was a game?" R.Doc. 208-3 at 26. If Ms. Hockridge were part of the conspiracy the government alleged, her response should have been, "well done."

Similarly, when Ms. Hockridge learned of a discrepancy in another application, she suggested "a plan to ensure we don't raise red flags to

the SBA about these inaccurate calculations, while ensuring 100% SBA compliance." R.Doc. 208-2 at 11. The plan? "Contact [the business] and get [missing documents]" to obtain accurate numbers. R.Doc. 208-2 at 11. If Ms. Hockridge had conspired to falsify PPP applications as the government alleged, there would be no need to get additional information from the borrower and no desire to "ensure[] 100% SBA compliance."

The jury never heard that exculpatory evidence, because none of those exhibits were admitted—nor were many others Ms. Hockridge repeatedly sought to introduce. *Compare* R.Doc. 208-1 at 1-7 (summary chart detailing evidentiary basis for admission of 30 exhibits), *with* ROA.1673 (exhibit list showing only ten of those exhibits were admitted). Even if those exhibits were not on their own conclusive evidence of good faith, their exclusion still denied Ms. Hockridge her right to mount an effective defense. Just as it admitted a small handful of exculpatory documents upon reconsidering its prior ruling, the court should have admitted them ***all***. Admitting only a few documents showing how Ms. Hockridge actively worked to prevent fraud misled the jury into believing those documents could be an exception, rather than the rule.

Had the court properly applied Rules 404(b) and 406, the proffered exhibits would have provided Ms. Hockridge more evidence to support the central claim of her defense: that while she may have been in ***proximity*** to fraud (indeed, she spotted and rejected potentially fraudulent applications), she was not ***in league*** with those committing fraud. At the very least, admission could have created the same reasonable doubt in the jury's minds for the conspiracy charge that led them to acquit Ms. Hockridge of wire fraud, thereby having "a substantial impact on the jury's verdict." *See United States v. Hagen*, 60 F.4th 932, 941 (5th Cir. 2023) (quotation omitted); *cf. Caro*, 569 F.2d at 418 (inconsistent verdicts "should engage our judicial skepticism").

#### 2. The Erroneous Exclusion of Exculpatory Evidence Also Impermissibly Limited Ms. Hockridge's Cross-Examination of Karnezis.

The exclusion of that evidence also violated the Confrontation Clause. The Constitution guarantees a criminal defendant the "opportunity for *effective* cross-examination" of witnesses against her. *Delaware v. Fensterer*, 474 U.S. 15, 20-21 (1985) (emphasis altered); U.S. Const. amend. VI. Here, Ms. Hockridge was denied an effective cross-examination of the government's key witness, Karnezis, against whom

confrontation was "especially important" given his "substantial reason to cooperate with the government." *United States v. Onori*, 535 F.2d 938, 945 (5th Cir. 1976); *cf.* ROA.4383-4384 (reflecting sentence reduction of ***6-9 years*** for Karnezis's cooperation).

To win her Confrontation Clause challenge, Ms. Hockridge "need not establish that the jury would have reached a different result." *United States v. Skelton*, 514 F.3d 433, 439-40 (5th Cir. 2008). She need only show, for "the particular witness," that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986) (alterations in original)). That test is met here.

Numerous excluded exhibits directly related to Karnezis's reliability, bias, and motives. *See, e.g.*, ROA.6695, 6717-6718 (Ms. Hockridge explaining redacted bank accounts to Karnezis and providing context for exemplar Schedule Cs), ROA.6853 (Ms. Hockridge telling Karnezis she contacted borrower to obtain as-filed tax return), R.Doc.208-1 at 8 (Ms. Hockridge confirming application's compliance with PPP requirements), R.Doc.208-1 at 24, ROA.2351, 2408-2409, 2456

(showing Ms. Hockridge was working to combat potential fraud). Although the Court ultimately admitted some of those documents, its delay in correcting its error prevented Ms. Hockridge from directly confronting Karnezis with evidence that contradicted his sworn testimony.

The erroneous exclusion of that evidence bears all the hallmarks of error identified in *Skelton*: Karnezis was an "importan[t]" witness (the ***most*** important); his testimony was not "cumulative;" the excluded evidence was the best and only evidence on which to "contradict[] the testimony . . . on material points;" there was no similar cross-examination otherwise permitted on such issues; and the overall strength of the government's remaining case was weak (as reflected by the four acquittals). *See Skelton*, 514 F.3d at 440 (quotations omitted).

The excluded evidence would have cast Karnezis's testimony in an entirely different light. Karnezis was the only witness to testify regarding the loans he submitted and the training that Ms. Hockridge provided him, and the excluded evidence directly countered his testimony on those issues. Karnezis claimed that Ms. Hockridge taught him how to commit fraud. But the excluded evidence directly contradicted that

claim, proving that Karnezis's self-serving testimony was a lie to downplay his own crimes by deflecting blame to others, just as he had when Ms. Hockridge confronted him with her suspicions about applications he submitted. *See* ROA.6745-6746, 6748-6749.

Ms. Hockridge had a right to confront Karnezis with that evidence to demonstrate she was not guilty of the fraud to which Karnezis testified (an argument that, for the counts not involving Karnezis, the jury accepted). But because the Court wrongly excluded those exhibits during Karnezis's testimony, Ms. Hockridge was instead limited to introducing them without a sponsoring witness and pointing the jury to the belatedly admitted exhibits during closing arguments, without the benefit of cross-examination that the Confrontation Clause guarantees.

#### 3. The Government Cannot Prove the Erroneous Exclusion of the Exculpatory Evidence Was Harmless Beyond a Reasonable Doubt.

Good faith was a complete defense to the charges Ms. Hockridge faced. ROA.1665. But the wrongful exclusion of exculpatory evidence denied Ms. Hockridge the right to introduce evidence establishing that defense. Because the government introduced a selective narrative of Karnezis's communications with Ms. Hockridge, the jury was denied the

full context needed to evaluate both his credibility and Ms. Hockridge's asserted defenses. And in light of the government's last-minute shift to a deliberate-ignorance theory, the erroneous exclusion of the evidence also prevented Ms. Hockridge from proving she did not "purposefully contrive" to avoid learning of falsehoods in borrower applications.

Given how critical the excluded evidence was to Ms. Hockridge's defense, the government cannot prove its exclusion was harmless beyond a reasonable doubt, *see Nguyen*, 504 F.3d at 571, especially given the "judicial skepticism" required in light of the acquittals, *see Caro*, 569 F.2d at 418. The combined effect of the exclusion of the exculpatory evidence (for which the court reversed itself, in part) and its impact on Ms. Hockridge's ability to exercise her Confrontation Clause rights against the government's star witness requires a new trial.

### C. The District Court Erroneously Admitted Numerous Hearsay Statements Under Rule 801(d)(2)(E) Without Any Foundation They Were Made in Furtherance of the Alleged Conspiracy

The lion's share of the evidence offered against Ms. Hockridge constituted inadmissible hearsay. *See* ROA.1906-1907 (demonstrating that, of the 192 exhibits admitted by the government, only 78 were admitted without a hearsay objection being made or preserved). Ms.

Hockridge sought to exclude those statements before trial and requested a pretrial hearing to contest their admissibility, and she repeatedly objected to their introduction at trial. *See* ROA.657, ROA.663, ROA.3646, ROA.3645-3646 (noting parties' stipulation to standing objection under Fed. R. Evid. 801(d)(2)(E), shorthanded as "no *new* objection" in later transcripts).

The court nevertheless admitted scores of hearsay statements without making a record as to what made them admissible. *See* Fed. R. Evid. 801(d)(2)(E); *see also United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979) (en banc) (requiring on-the-record determination whether purported coconspirator statements are admissible). Admitting those statements was an abuse of discretion requiring reversal. *See United States v. Guidry*, 456 F.3d 493, 501 (5th Cir. 2006).

### 1. The Court Improperly Admitted Scores of Hearsay Statements.

Coconspirator statements are an exception to the hearsay bar only if, prior to admitting the statements, a court is "satisfied that the statement actually falls within the definition of the Rule." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see United States v. Fragoso*, 978

F.2d 896, 900 (5th Cir. 1992) (court has a "duty to make findings" before "admitting coconspirator statements.").

Here, that preliminary determination did not occur either before or during trial, resulting in two categories of improper hearsay being admitted in violation of Rule 801(d)(2)(E): (1) statements admitted without determining ***whether*** they furthered any conspiracy; and (2) statements that in fact ***did not*** further any conspiracy. As the proponent of the evidence, the government had to establish by a preponderance that the statement was not only "made by a co-conspirator," but also "made during the course of the conspiracy" and "in furtherance of the conspiracy." *See United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999). The court failed to hold the government to that burden.

*First*, many hearsay statements were admitted without any foundation that they advanced any conspiracy. A statement ***about*** an alleged conspiracy is not enough; the statement must have been made ***to further*** the conspiracy. "Mere conversation between conspirators is not admissible under the exception"—the government had the burden to show the statements "'advance[d] the ultimate objectives of the

conspiracy.'" *United States v. McConnell*, 988 F.2d 530, 533 (5th Cir. 1993).

Indeed, discussions that "report the status of the conspiracy" do not qualify under the exception, because they do "nothing to advance the cause of or facilitate the conspiracy." *Fratta v. Quarterman*, 536 F.3d 485, 504 (5th Cir. 2008) (quotations omitted). Yet even the most charitable reading of several of the admitted communications fell into that category. *See, e.g.*, ROA.6422-6423 (notifying borrower that his loan was successfully processed).

Worse still, many of the statements were about applications submitted during PPP "Round 1" in 2020—a period during which there was scant evidence Ms. Hockridge had any participation or involvement (as the acquittals reflect) *See, e.g.*, ROA.6863 (alleged coconspirators discussing their Round 1 applications outside Ms. Hockridge's presence), ROA.6880-6882 (alleged coconspirators submitting Round 2 application for loan they prepared, but not submitted during Round 1).

Even where there might have been a plausible basis for admission, the government "failed to present any evidence whatsoever concerning the context in which [each] statement was made," which makes it "not

possible for this Court to determine the basis for the trial court's implicit finding that the statement was made in furtherance of the conspiracy." *McConnell*, 988 F.2d at 533-34. "Without a finding that the proper predicate had been laid" to show "that the statement[s] had been made in furtherance of the conspiracy," the court "did not have discretion to allow the statement[s] into evidence." *Id.* at 534.

*Second*, numerous statements that plainly did not further any conspiracy were admitted. Several of those were made ***after*** the supposed criminal conduct had occurred. *See, e.g.*, ROA.6369 (borrower informing Ms. Hockridge lender approved him for smaller loan after he submitted his finalized tax documents), ROA.6393 (Mr. Reis discussing loans after approval), ROA.6404-6405 (borrower telling Ms. Hockridge, after his forgiveness application was denied, that Mr. Reis had completed his draft tax documents), ROA6497-6498 (borrower stating he'd already spoken to Mr. Reis about draft Schedule C), ROA.6607 (Mr. Reis and Flores discussing Round 1 after it had ended).

The court simply lacked discretion to admit those statements, as they were not made in furtherance of any conspiracy. *McConnell*, 988 F.2d at 534; *United States v. Reed*, 908 F.3d 102, 118 n.57 (5th Cir. 2018)

(statements made by coconspirators after conspiracy ends are not admissible). Ms. Hockridge objected, for example, to many statements that plainly could not have advanced any conspiracy and yet were deeply prejudicial. *See* ROA.6854 (joking about a song written by a third-party alleging fraud by Blueacorn applicants), ROA.6855 (the song). Admitting those statements violated the "scrupulously observed" rule that for "hearsay statements by some conspirators to be admissible against others[,] [they] must be made in furtherance of the conspiracy charged." *Krulewitch v. United States*, 336 U.S. 440, 443-44 (1949).

**2. These Repeated Errors Require a New Trial.**

The erroneously admitted statements were not one-offs. Indeed, most of the exhibits (114 out of 192) admitted against Ms. Hockridge consisted of inadmissible hearsay. *See* ROA.1906-07. There is therefore no doubt that "the erroneous admission or exclusion of [such] evidence" "infect[ed] the trial." *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022). The admission of such those statements allowed the government to obtain a conviction based on fraud "swirling around" Ms. Hockridge, *see* ROA.5580, despite lacking reliable evidence suggesting her knowing participation in any conspiracy. Particularly given the

jury's across-the-board acquittals on the wire fraud counts, this Court "cannot say that the erroneous admission of [those statements] may not have been the weight that tipped the scales against" her. *Krulewitch,* 336 U.S. at 445. Especially when considered alongside the other errors committed below, the erroneous admission of such large volumes of inadmissible hearsay requires a new trial.

### D. The District Court Erroneously Allowed the Introduction of Confidential Spousal Communications by Conflating the Spousal Communications Privilege with the Spousal Testimonial Privilege.

The court committed another fundamental evidentiary error by admitting numerous private spousal communications. *See, e.g.*, ROA.3614. The court did so because it incorrectly believed the spousal communications privilege "appl[ies] only to ***trial testimony*** of a spouse." R.Doc. 137 at 5 (citing *United States v. Miller*, 588 F.3d 897, 904 (5th Cir. 2009) (emphasis added)). That is not the law, and this Court reviews rulings on such legal issues de novo. *See United States v. Sariles*, 645 F.3d 315, 317 (5th Cir. 2011).

Spousal privilege does protect against spousal trial testimony, but it ***also*** protects "confidential marital communications between the spouses." *Miller*, 588 F.3d at 904. In *Miller*, that evidence took the form

of testimony. But the privilege's protections are not limited to trial testimony. *See United States v. Archer*, 733 F.2d 354, 359 (5th Cir. 1984) (communications "uttered in private between husband and wife . . . ordinarily cannot be admitted in evidence"). The admission of privileged spousal communications therefore violated the privilege and itself warrants a new trial.

## III. The Prosecution Violated *Brady* When It Withheld Exculpatory Evidence to Which It Had Access Via Its Coordinated Investigation with the Oregon USAO.

The Due Process Clause requires that the government disclose evidence that is (1) favorable to a defendant and (2) material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* applies to both substantive and impeachment evidence. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). *Brady* requires that, in the "interests of inherent fairness," the prosecution "produce certain evidence actually or constructively in its possession *or accessible to it*." *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (quoting *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975) (emphasis added)). It thus imposes an affirmative duty on prosecutors "to learn of any favorable evidence known to the others acting on the government's behalf in [the]

case." *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (quotation omitted). This Court "review[s] de novo whether the government violated the *Brady* rule." *United States v. Valencia*, 600 F.3d 389, 418 (5th Cir. 2010).

The prosecution violated *Brady* when it withheld until after trial material evidence about its star witness. That evidence was available to the prosecution, which jointly investigated Karnezis with their colleagues from the Oregon USAO, from whose files they had ***produced hundreds of thousands of pages of documents pretrial***. ROA.5814. Because the prosecution could have obtained this crucial evidence merely by asking the Oregon USAO, *Brady* required it to obtain and disclose that evidence before trial. The government's failure to observe *Brady*'s constitutional command requires reversal.

### A. *Brady* Requires the Government to Disclose Information the Prosecution Team Can Access.

*Brady* does not permit ostriching. Where a prosecutor could have learned of exculpatory evidence, *Brady* obligates him to do so. *See Auten*, 632 F.2d at 481 (prosecution violated *Brady* by failing to "run an FBI or NCIC check on [a] witness," since that information was "known" to the government in "the context of the disclosure requirements"). Where a

prosecution team has "access" to such evidence, it must obtain and disclose it. *Id.* (citing *United States v. Deutsch*, 475 F.2d 55 (5th Cir. 1973)).

*Brady* applies to "files maintained by branches of government closely aligned with the prosecution" and technical "bureaucratic boundar[ies] [are] too weak to limit the duty." *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (quotation omitted). Indeed, *Brady* applies even to ***different*** agencies (the DOJ and SEC) conducting parallel (rather than coordinated) investigations. *See United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012) (Rakoff, J.) ("[W]hen it comes to *Brady* disclosures, the relevant context is one of fact-gathering, not charging determinations" and "it is enough that the agencies are engaged in coordinated fact-gathering, even if they are making separate investigatory or charging decisions.").

Here, as the government itself explained, its charges against Ms. Hockridge arose from a coordinated joint operation between components of the ***same*** agency: the trial team (consisting of an N.D. Texas AUSA and multiple DOJ attorneys) and the Oregon USAO. *See* R.Doc. 332-1 at 4 n.3. It would be typical for the trial team to have at least constructive

possession of the withheld evidence, as is standard in multi-district operations across DOJ offices. *See* U.S. Dep't of Just., *Justice Manual* § 9-5.002(A) (in "multi-district investigations," the "prosecution team" includes "both Assistant United States Attorneys and prosecutors from a Department litigating component or other United States Attorney's Office," thus reaching "parallel criminal and civil proceedings").

But even if it lacked actual possession, the prosecution certainly had ***access*** to the withheld evidence through its coordinated investigation. Indeed, the withheld witness interviews occurred at the same time as Ms. Hockridge's voluntary interview—GW3's interview is dated the ***same day***; GW2's is dated a day prior. R.Doc.342 at 5, R.Doc.329-6 at 3, ROA.3857. Those files (like Ms. Hockridge's own interview report) were all maintained by the Oregon USAO, where the interviews were conducted. ROA.2168. The very nature of a ***coordinated joint investigation*** means the files were available to the prosecutors. The prosecution could readily learn those interviews occurred and related to Karnezis; yet it evidently failed to request the reports pretrial and only turned them over after it was too late.

The government had access to the withheld materials because it ultimately obtained them simply by asking the Oregon USAO. It did not need to subpoena or otherwise compel compliance. *See* ROA.2155. That means the information was "readily available" to the government and should have been disclosed pretrial. *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991); *see also United States v. Garner*, 507 F.3d 399, 406-07 (6th Cir. 2007). Indeed, it is difficult to imagine what materials would be "readily available" for *Brady* purposes if not those held by a companion office of the same agency in a coordinated investigation. *See United States v. Shakur*, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982) ("hypertechnical and unrealistic" for the government to argue that cooperation between the S.D.N.Y. and Brookyln DA did not trigger *Brady*).

### B. The Withheld Evidence Was Favorable and Material.

The government did not disclose the withheld evidence until ***three months*** after trial. That evidence (1) supported Ms. Hockridge's key contention that she never knowingly joined any conspiracy; and (2) squarely contradicted Karnezis's testimony in key aspects, including revealing he twisted the facts to connect Ms. Hockridge to his own fraud.

The evidence took the form of three interviews[4] of witnesses involved in fraudulent applications with Karnezis, all before Karnezis ever met Ms. Hockridge.

At trial, Karnezis testified he ***followed*** Ms. Hockridge's training and instructions to commit fraud in 2021. *See, e.g.*, ROA.5580, ROA.4243, 4245, 4278. Yet GW1's account reveals Karnezis as a ***leader*** of the fraud. Karnezis testified he met Ms. Hockridge in January 2021, ROA.4307, 4342-4343. Yet GW1's account indicates that Karnezis was involved in PPP fraud earlier—including in mid-2020. That claim is corroborated by GW3's statements that he received PPP loans in 2020 through Karnezis's associate. *See* R.Doc. 329-6 at 26-27.

In fact, Karnezis was not simply following orders from Ms. Hockridge, as GW3 recounted Karnezis conspiring with a corrupt SBA employee to get applications approved. *Compare* R. Doc. 329-6 at 12-13, 41, *with* ROA.4315. Had Ms. Hockridge had such evidence, it would have supported her theory of defense. It also would have allowed Ms. Hockridge to impeach Mr. Karnezis's testimony that Ms. Hockridge knew

[4] These witnesses are referred to here, as below, as "GW"—that is, "Government Witness" 1, 2, and 3. Sealed documents reflecting the true names can be found at R.Docs. 329-2, 329-5, and 329-6.

about fraud but was trying to "ke[ep] the chats clean"—testimony that the government used to transmogrify facially exculpatory evidence into supposed confirmation of guilt. ROA.4253. Indeed, GW3's interview shows Ms. Hockridge thought loans were legitimate—because ***Karnezis led her to believe they were legitimate***—when they were in fact fraudulent. *Compare* R.Doc.329-6 at 12-13 (GW3 testifying he submitted a false PPP loan application with Karnezis's assistance), *with* ROA.2137 (showing Karnezis led Ms. Hockridge to believe GW3's loan application was legitimate).

GW3's statements also showed Karnezis assisting him with a false application and misleading Ms. Hockridge about its legitimacy. R.Doc. 329-6 at 12-13. When an SBA investigator called GW3 to inquire about his application, Karnezis wrote Ms. Hockridge for advice. Karnezis explained, "I never put [GW3's] phone number on the application so I'm wondering if this is legit?" *See* ROA.2137. Ms. Hockridge, unaware of any falsehood in GW3's application, replied that Karnezis should "[j]ust have [GW3] talk to the SBA guy and provide all necessary paperwork. He should be just fine[.] [The lender] was probably being safe rather than sorry." ROA.2137. Karnezis's "clean paper trail" explanation of

exculpatory texts with Ms. Hockridge simply does not credibly explain that exchange.

Had Ms. Hockridge had the essential context provided by GW3's interview at trial, she could have used that exchange to show the jury an example of Karnezis asking about an application he knew—but ***concealed from Ms. Hockridge***—was fraudulent. GW3's interview would have allowed Ms. Hockridge to undercut Karnezis' credibility (by showing that he lied to Ms. Hockridge) and to underscore the implausibility of the government's claim that she conspired with Karnezis. *Cf. United States v. Cessa*, 861 F.3d 121, 132 (5th Cir. 2017) ("[E]ven if the Government were correct that [some specific statements in undisclosed evidence] are not favorable, we would still find the 302s as a whole contained favorable impeachment evidence."). The government's failure to produce the withheld evidence deprived Ms. Hockridge of that opportunity.

At the end of the day, this case pitted scores of facially exculpatory text messages against the inculpatory testimony of a cooperating witness hoping to get a lighter sentence. Karnezis's credibility was central, which is exactly why the withheld evidence was material.

### C. The Cumulative Effect of the Withheld Evidence Establishes Its Materiality and Precludes a Finding of Harmlessness.

Each piece of withheld evidence alone violated *Brady* and warrants a new trial. Taken together, the prejudicial effect is unquestionable. Undisclosed evidence must be considered in light of its cumulative effect to assess its "potential impact on the outcome of the trial." *United States v. Sipe*, 388 F.3d 471, 491 (5th Cir. 2004). To show a *Brady* violation, Ms. Hockridge need not show the government failed to present "*sufficient* evidence to support a finding of guilt," *id.* at 492 (emphasis added), merely that the withheld evidence leaves room for reasonable doubt that "undermine[s] confidence in the outcome." *United States v. Dvorin*, 817 F.3d 438, 451 (5th Cir. 2016). Here, it is at least reasonably probable that the withheld evidence would have weakened the government's conspiracy case such that the jury would have returned the same verdict on conspiracy as it did on four wire fraud counts, making it impossible for the government to establish that its *Brady* violations were harmless.

Cumulative prejudice from withheld credibility evidence warrants a new trial even if any one piece of withheld material evidence, on its own, seems minor. *See Sipe*, 388 F.3d at 491 (*Brady* is violated where

the "cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result") (cleaned up). Here, by contrast, the weight of the newly disclosed evidence was substantial. The evidence "would have allowed [Ms. Hockridge] to attack the government's case from every angle," *id.* at 491, and "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Strickler*, 527 U.S. at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Had Ms. Hockridge had that evidence, she could interviewed the undisclosed witnesses, called them at trial, and confronted Karnezis with the contradictions created by their testimony. The government's violation of *Brady* deprived her of those opportunities, thereby mandating a new trial.

Ms. Hockridge also sought below for the government to produce any additional *Brady* materials, but the court denied her request without a hearing. ROA.415, R.Doc.345. When it grants a new trial to remedy the Government's known *Brady* violation, the Court should also require the government on remand to produce ***all*** material exculpatory evidence in the possession not only of the trial team, but also the Oregon USAO and

its "filter" attorneys. *See* ROA.298-322; R.Doc.329; ROA.2110; ROA.2116.

## IV. The District Court's Sentencing Errors Require Reversal.

Error likewise infected Ms. Hockridge's sentencing. At trial, the government identified alleged false statements in fewer than 30 loan applications. ROA.5771. But at sentencing, the court unreasonably held her responsible for more than 400 loans and more than $64 million in losses under both U.S.S.G. § 2B1.1 and the Mandatory Victim Restitution Act ("MVRA"). It did so without requiring the government to prove the alleged losses were caused by any false statements in the loan applications or establish what portion of any loan was legitimately obtained, and without affording Ms. Hockridge the opportunity to confront the sole witness upon whom the government's loss theory rested (once again, Karnezis). Worse, the Court misapplied the recently amended Guidelines, holding Ms. Hockridge accountable for conduct for which she was ***acquitted*** and which was ***not necessary*** to establish the sole count of conviction, leading to a substantively unreasonable sentence.

Because each of those errors related to the Court's "methodology for calculating the loss amount," this Court's should vacate Ms. Hockridge's sentence on *de novo* review. *See United States v. Barnes*, 979 F.3d 283, 311-12 (5th Cir. 2020) ("We consider de novo *how* the sentencing court calculated the loss, because that is an application of the Guidelines, which is a question of law." (citation modified)).

### A. The Court Failed to Require the Government to Prove the Loans Included in Its Loss Calculation Were the Result of Any False Representations.

To obtain a conviction for conspiracy, the government need not prove that any victim relied on any false representation. *Kousisis v. United States*, 605 U.S. 114, 150 n.2 (2025). But at sentencing, a defendant is only responsible for losses that were ***caused*** by the criminal conduct. *See* U.S.S.G. § 2B1.1, app. note (limiting "actual loss" to "reasonably foreseeable pecuniary harm that ***resulted from*** the offense"); 18 U.S.C. § 3664(e) ("The burden of demonstrating the amount of the loss sustained by a victim *as a result of the offense* shall be on the attorney for the government." (emphases added)).

For the vast majority of the loans at issue, the government did not produce any evidence that the applications contained any false

representations whatsoever. Instead, the government attempted to "categorize" the loans based on criteria bearing on eligibility, such as criminal or military history, without identifying any falsehoods in the applications themselves. ROA.5778. Ms. Hockridge presented unrebutted testimony from an expert debunking each of the government's "categorizations," demonstrating that the government had counted numerous loans with no indicia of fraud and had failed to demonstrate that all but ***five*** of the nearly 450 loans it cited contained any falsehoods. ROA.5795-5796. Without that evidence, the court had no basis to conclude the loans "resulted from" any false representations, making its loss calculation erroneous.

### B. The Court Failed to Require the Government to Demonstrate What Portion of Any Loan Would Have Been Obtained Absent Any Alleged False Representation.

That error compounded because the government did not reduce its loss calculation by the amount borrowers would have received if not for any false representations, as the Guidelines require, and by any repayments, as the MVRA requires. The Guidelines are clear: "in a case involving government benefits (*e.g.*, grants, ***loans***, entitlement program payments)," loss for sentencing purposes is not the ***gross*** amount paid by

the government, but instead the ***net*** amount after accounting for fraud. *See* U.S.S.G. § 2B1.1 (emphases added); *see id.* app. note 3(E)(ii) ("For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, ***loss is $50***," not ***$150***. (emphasis added)).

For the government to demonstrate any loss in this case, it needed to show how much each borrower would have received in the absence of any falsehoods, not merely the gross amount of the loan obtained. Because the government presented evidence of falsehoods for only ***five*** loans, *see supra*, it failed to carry its burden to show net loss. And since it failed to apply a credit for any monies returned to the government by borrowers "before the offense was detected," it further inflated the true loss. *See* U.S.S.G. § 2B1.1 app. note 3(D)(i); *see also United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013) ( "[A] defendant should not be held accountable for the total amount of benefits obtained, when some portion of that benefit would have been obtained absent the fraudulent conduct[.]"); *United States v. Mahmood*, 820 F.3d 177, 193-94 (5th Cir. 2016) (finding error in refusing to credit amounts Medicare would have reimbursed even absent fraud); *see also United States v. del Carpio*

*Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) (requiring offset to restitution when not doing so "would result in double recovery to the victim").

### C. The Court Erroneously Precluded Ms. Hockridge from Calling Karnezis to Dispute the Government's Loss Calculations at Sentencing.

Karnezis's central role at trial repeated itself at sentencing. Sentencing centered upon the singular issue of how many of the loans referred by Karnezis contained materially false statements, how much (if at all) those statements affected the loan amount, and whether any such losses were reasonably foreseeable to Ms. Hockridge. Ms. Hockridge repeatedly requested the opportunity to call Karnezis at sentencing, and she went to great lengths to secure his appearance despite his repeated efforts to evade service. ROA.5764, 5772. The court improperly denied Ms. Hockridge that opportunity, instead accepting the government's claims without permitting adversarial testing through cross-examination. At the very least, Ms. Hockridge should be entitled to that opportunity on remand.

The court denied Ms. Hockridge's request for two reasons, neither of which stands up to scrutiny. *First*, it claimed that Karnezis had testified at trial that 90% of the loans he referred were "fraudulent"

(without any further foundation or elaboration). ROA.5825. But that is not what Karnezis said. Instead, he testified that 90% of what he "brought in" through his "full pipeline" was fraudulent—i.e., the applications that he referred to Ms. Hockridge, not the subset that were ***funded.*** That difference was critical, since Ms. Hockridge had rejected ***hundreds*** of applications submitted through Karnezis because she suspected they might be fraudulent. *See* ROA.6676-6678.

By treating the government's "90%" as establishing more than $60 million in ***actual*** losses when there was no "evidence to support it" in the record, the court relied upon a clearly erroneous finding and thereby *ipso facto* abused its discretion. *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) ("A finding is 'clearly erroneous' when although there *is* evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."); *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) ("A district court abuses its discretion if it . . . relies on clearly erroneous factual findings[.]" (quotation and citation omitted)).

*Second*, even if Karnezis had testified at trial as the court erroneously believed, trial did not afford Ms. Hockridge an adequate

opportunity to confront those claims. As explained below, *see infra* § V, the jury was not asked to make any determination as to the amount of the loss at trial (which was not in issue), and Ms. Hockridge had no obligation to spend her examination of Mr. Karnezis covering that irrelevant ground. And as explained above, *see supra* § II-B, the court significantly confined Ms. Hockridge's cross-examination of Mr. Karnezis in any event, further limiting her ability to impeach him at trial. By doubling down on that error at sentencing, the Court improperly prevented Ms. Hockridge from disputing the only evidence that elevated her Guidelines from the basement to above the statutory maximum.

### D. The Court Erroneously Considered Conduct Underlying the Acquitted Counts in Sentencing Ms. Hockridge.

The court committed a yet more fundamental sentencing error when it considered as "relevant conduct" conduct for which Ms. Hockridge was "acquitted in federal court." U.S.S.G. § 1B1.3(c). The jury acquitted Ms. Hockridge of all substantive charges, convicting her only of conspiracy under 18 U.S.C. § 1349. Thus, under the new version of U.S.S.G. § 1B1.3(c), the court was not permitted to consider any conduct underlying those counts (e.g., the devising and execution of the alleged

scheme to defraud) unless that conduct "establishe[d]" the conspiracy. *See id.* (precluding consideration of acquitted conduct "unless such conduct also *establishes*, in whole or in part, the instant offense of conviction") (emphasis added). In doing so, it not only violated the new Guideline; it also violated Ms. Hockridge's constitutional right to trial by jury. *See McClinton v. United States*, 143 S. Ct. 2400, 2400-03 (2023) (statements by Kavanaugh, Gorsuch, Barrett, & Sotomayor, JJ., regarding denial of certiorari).

Since § 1349 has no overt act requirement, *see United States v. Njoku*, 737 F.3d 55, 67 (5th Cir. 2013), all the government had to prove at trial was an unlawful agreement, not that Ms. Hockridge executed or otherwise participated in the conspiracy.[5] And under the deliberate-ignorance instruction the court erroneously provided, the jury did not even have to find that Ms. Hockridge knew of any falsehoods in borrower applications. *See supra* § I-B. Under those circumstances, it violated the new Guideline for the court to count any alleged losses as within the

[5] And indeed, based upon the jurors' post-trial comments made in the presence of counsel for both parties, it appears that the jury did not believe that she had done anything more than fail to "stop" the criminal conduct of others. *See* R.Doc.268-1 ¶ 20.

scope of "relevant conduct." Instead, the court should have only considered as relevant conduct the conduct that was necessary to "establish" the conspiracy:

> First: That the defendant and at least one other person made an agreement to commit the crime of wire fraud;
>
> Second: That the defendant knew the unlawful purpose of the agreement; and
>
> Third: That the defendant joined in the agreement willfully, that is, with knowledge of the specific intent to further an unlawful purpose.

ROA.1658. Since that count did not require Ms. Hockridge to have "employed material false representations," "devised . . . a scheme to defraud," or "cause to be transmitted . . . any writing sign, or signal for the purpose of executing such scheme," ROA.1661 (wire fraud instruction), such conduct was not necessary to "establish[], in whole or in part, the instant offense of conviction" and thus should not have been considered as relevant conduct pursuant to the new § 1B1.3(c).

The court's erroneous consideration of acquitted conduct (e.g., "employ[ing] material false representations"), like the other errors in its loss methodology, resulted in a radically overstated Guidelines range and rendered the ultimate sentence substantively unreasonable. *See Jones*

*v. United States*, 574 U.S. 948, 948 (2014) (Scalia, Thomas, and Ginsburg, JJ., dissenting from denial of certiorari) (explaining why a sentence that would be substantively unreasonable in the absence of judge-found facts is unconstitutional). Thus, even if Ms. Hockridge were not entitled to a new trial, she is at least entitled to a new sentencing under properly applied Guidelines. *Rosales-Mireles v. United States*, 585 U.S. 129, 145 (2018) (holding that even unpreserved errors affecting a Guidelines range require resentencing).

## V. The District Court Erroneously Imposed a Restitution Order Based on Its Own Loss Determination, Without Any Jury Findings.

When the jury returned its verdict, it decided nothing about the dollar amount of any losses allegedly resulting from the charged offense. Yet the court ordered Ms. Hockridge to pay nearly ***$64 million*** in restitution, based on the court's own loss findings. Because the Supreme Court has clarified that ***all facts*** supporting the imposition of a criminal punishment—including restitution under the MVRA—must be found by a jury (not a judge), the court erred and, on *de novo* review, this Court must vacate the restitution order. *See United States v. Rosbottom*, 763

F.3d 408, 419 (5th Cir. 2014) ("We ordinarily apply de novo review to a restitution award's legality[.]").

### A. After *Erlinger* and *Ellingburg*, Judicial Fact-Finding Cannot Support a Criminal Restitution Order.

The Sixth Amendment protects the right "[i]n all criminal prosecutions" to "trial, by an impartial jury." U.S. Const. amend. VI. To satisfy that requirement and due process, any fact[6] that increases a criminal defendant's potential punishment must be charged, tried, and proven to a jury beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000).

But here, the court imposed a monumental restitution order without a single jury-found fact to support any restitution loss amount (much less the $64 million the court imposed). That violates *Apprendi* and the cases that follow it.

Latching onto a single phrase in *Apprendi*—that juries must find "any fact that increases the penalty for a crime beyond the prescribed statutory maximum," *see Apprendi*, 530 U.S. at 490—this Court previously held that "with respect to restitution . . . *Apprendi* is

[6] The sole exception being the (here irrelevant) fact of a prior conviction. *See Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000).

inapposite because no statutory maximum applies to restitution," *Rosbottom*, 763 F.3d at 420 (cleaned up); *see United States v. Odak*, 802 F. App'x 153, 154 (5th Cir. 2020).

But intervening Supreme Court precedent vitiates that holding, clarifying that (1) the imposition of restitution is a criminal punishment; and (2) *Apprendi*'s jury fact-finding requirement applies to every fact necessary to authorize a particular statutory punishment, not merely those with a determinate numerical maximum. This case presents this Court with its first opportunity to apply those intervening precedents to restitution. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (prior decisions not binding when the Supreme Court "establishes a rule of law inconsistent with" them (quotation omitted)).

*First,* just this term, the Supreme Court held that "[r]estitution under the MVRA is plainly [a] criminal punishment." *Ellingburg v. United States*, 146 S. Ct. 564, 567 (2026). Thus, any criminal restitution order must be supported by jury-found facts on loss.

*Second*, the Court recently held that the jury trial right "requir[es] a unanimous jury to find ***every fact*** essential to an offender's punishment." *Erlinger v. United States*, 602 U.S. 821, 832 (2024)

(emphasis added). Squarely undercutting the foundation on which *Rosbottom* rests, the Court held that principle "does not just apply when a judge seeks to issue a sentence that exceeds the *maximum* penalty authorized by a jury's findings (or a guilty plea)." *Id.* at 833. It applies to every fact, because the Bill of Rights entrusts the fact-finding function to ***the jury***, and "[j]udges may not assume the jury's factfinding function for themselves, let alone purport to perform it using a mere preponderance-of-the-evidence standard." *Id.* at 834. The quantum of restitution—the loss amount—is therefore something ***a jury*** must decide.

*Erlinger* and *Ellingburg* also reinforce the Court's prior holding that "[c]riminal fines," just like "other forms of punishment, are penalties," with the fine amount "often calculated by reference to particular facts." *S. Union Co. v. United States*, 567 U.S. 343, 349 (2012). Because *Apprendi* "never distinguished one form of punishment from another," its jury fact-finding requirement applies equally to facts that determine the length of incarceration, the amount of a criminal fine, or the amount of restitution. *See id.* at 350.

### B. The District Court's Failure to Follow *Erlinger* and *Ellingburg* Requires Vacatur of the Restitution Penalty.

The jury findings required by *Erlinger* and *Ellingburg* were not made here. The verdict form did not ask the jury to make ***any*** findings about loss amount, victim harm, or causation. ROA.1646-1666. Not even the indictment specified a loss amount. *See* ROA.1123-1135. As a result, the jury made no findings to support restitution.

The factual basis for the Court's restitution award instead came exclusively from judge-found facts at sentencing. That imposed a twofold constitutional harm: the facts underlying Ms. Hockridge's criminal restitution order (1) were found by a judge, not a jury, (2) under a preponderance standard (not the reasonable doubt standard). Both harms require the restitution order be vacated. *See United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012) ("excessive restitution awards" are not subject to harmless-error review).

## CONCLUSION

The errors below were myriad. Each alone would merit relief. But the combined force of those errors taken together—the instructional errors, evidentiary errors, insufficiency problems, and sentencing mistakes—should, at the very least, leave the Court with the distinct

sense an injustice was done. The cumulative error doctrine provides relief in such circumstances, where "an aggregation of non-reversible errors" can "yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir.1998); *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) ("synergistic or repetitive error violates the defendant's constitutional right to a fair trial").

This case suffered from significant error at every stage. Any one suffices to justify reversal; taken together, they demand it.

Date: May 15, 2026

Respectfully submitted,

*/s/ Barbara Smith Tyson*

Barbara Smith Tyson
Richard E. Finneran
Kolten C. Ellis
BRYAN CAVE LEIGHTON PAISNER LLP
211 N. Broadway, Ste 3600
St. Louis, MO 63102
(314) 259-2000
richard.finneran@bclplaw.com
barbara.smith@bclplaw.com
kolten.ellis@bclplaw.com

*Attorneys for Appellant*

## Certificate of Service

I hereby certify that on May 15, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. All counsel of record in this case will be served by the CM/ECF system.

*/s/ Barbara Smith Tyson*
Barbara Smith Tyson

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief complies with the requirements of Fed. R. App. P. 32(a)(5-7) and Circuit Rule 32.3 because:

1. this document has been prepared in a proportionally spaced typeface using Microsoft Word, in Century Schoolbook 14-point font; and
2. excluding items under Fed. R. App. P. 32(f), the foregoing brief contains 12,964 words.

*/s/ Barbara Smith Tyson*
Barbara Smith Tyson